Ok, Mr. Christensen. Yes. Good morning, sir. You may proceed. Good morning. May it please the court. I represent the defendant here, the appellant, the defendant in the lower court. This case involves the Uniformed Service Employment and Reemployment Act, a federal statute. The plaintiff below, her name was Kieshia Mace. She's a young lady, and she worked approximately 13 hours a week at a place, the defendant's place, called Kickbox. And it was a physical education place, workout place. And what Kieshia would do when she'd go in and assist the patrons in working out and this and that. What's interesting and very important in the case is that Ms. Mace had no guarantee of ever getting any hours to work. She testified to that at trial. She had no guarantee of ever working at this Kickbox place. But she'd customarily been receiving hours. She had been averaging about 13.6 hours per week. And there was testimony that she had been, quote, replaced. Isn't that right? Someone had been hired in her place, and so she wasn't going to be rehired? Well, first of all, I don't think she was ever hired. I think she was in a pool of workers. Okay. Your Honor. I thought that testimony was that they found somebody else to take whatever, however you want to characterize her slot. Isn't that correct? That's correct. What she did is she was a proud member of the South Dakota National Guard, and her orders stated that she had to go to Alaska for three weeks of training. So in July of 2017, she goes to Alaska, trains with the her service. We're very proud of that. She comes back and notifies, she sends a text message to my client, Corey Willis, who owned Kickbox, and said, I'm back in town. Mr. Willis didn't reply to that text message. So the next day, Ms. Mace calls Willis and leaves a message and states that I'm back in town, and I'm concerned that I'm not on the work app. They used an app for their schedule, and she wasn't on. In fact, I think she's blocked out of it. So that is true. When she went off to serve during those three weeks, she was not on the schedule. Because of this type of business, people come and go quickly. Other people did replace her time slot. Isn't the chance for hours essentially a job in itself? That's the whole point of the app, right? You sign up, and in fact, the past experience here was that she received hours on a regular basis. That's correct. The concern I have is she wasn't guaranteed any hours. That's the fact of it. That was the judge at Duffy . . . Guaranteed a place on the app? No. Why not? I think the only thing she was . . . I don't think she was guaranteed anything. I think the only thing she had was a . . . Well, I mean, aside from it being an at-will situation, leaving that to one side for the moment, so long as the employment hadn't been replaced back on the app, wasn't she? I think the only thing she was entitled to was to be part of a pool that could be placed on the app. The app actually set the schedule. Okay. So I think the only thing she had was to be in a pool. That's a good correction, but that's essentially what I was talking about. She had . . . That was what she had when she left, and so she should have had that when she got back. Yeah, and I think she had that when she got back. I think she had everything before she left. I think she had everything she had before she left after she came back. Well, she had an expectation of being put on the app. Exactly. She did. Which is, it seems to me, a form of employment. Well, I would disagree with that, but that's certainly . . . I think that's where the problem comes in with this case, is she had . . . And then I think it was complicated by the fact that the communications they had kind of got at cross ends. I think Ms. Mace did conclude that she was fired. She felt she was fired, but with this arrangement, I don't think she could be fired. I can see how she thought she may have been fired, but she wasn't fired. There was no testimony that she was fired. She just felt that because I wasn't on the app that she was fired. Then through the communications, my client called her and eventually . . . And Ms. Mace knew it was Corey Willis, kickbox, calling her. She refused to . . . My client would have told her, well, let's get you back on the schedule. I had someone quit, and let's get you back on. I think she has to take some responsibility. Are you suggesting, and perhaps or not, that she is trying to manufacture a legal claim? No, I'm not saying that. No. Well, I guess you could look at it that way. If she would have answered the phone, my client would have said, come on in, I'll get you on the schedule. I had somebody quit. It would have been . . . I think probably the big part of the problem would have gone away. I suppose maybe the response to that would be that employers are supposed to . . . are charged with the knowledge of the requirements of this act and that he was required to do more than he actually did. I don't know if that's true. Well, maybe, but my client isn't disputing anything that Ms. Mace did. She went off the National Guard. She came back and promptly notified them. What my concern is, is I think the way what Judge Duffy did is added more to her situation than she had when she left. Can you drill down on that a little bit more? What more was she asking for or expecting upon her return than this sort of loose employment arrangement that she had previously? Well, I think she expected to be on the schedule and working. That's what I think she expected. And that's what she was . . . that was her situation before she left? Yes. She was on the schedule and working? Yes. She was averaging 13.6 hours a week. But so where do you factor in that she wasn't guaranteed even to be put on the schedule? If before she left to the National Guard, if she wasn't put on the schedule, she couldn't complain about it because that was the deal. See, that was the deal that they struck. It's an odd working relationship. I get that. But that's what it was. She testified to it. Judge Duffy said, yes, the evidence shows that she was not guaranteed any hours. And I think that's the key. How can she come back and then want to be guaranteed hours? See? And maybe it's the word guaranteed. Is that . . . was that the focus or was it to be just in the pool to be considered for hours? Is there a difference between sort of being cut out of pool altogether and . . . but being in the pool but just not guaranteed any particular number of hours? Yes. I think that's . . . there's a distinction. I don't think when she came back, I don't think she was cut out of the pool. See? I don't think there's no testimony that she was cut out of the pool. She assumed, I think, she was. But she was never cut out of the pool. I'm sorry. Wasn't there testimony that she'd been, quote, replaced by somebody? Well, when she was gone, I don't think it was . . . Before and after, I mean. Yeah. When she left, they had to fill her spot. Well, yeah. So that's . . . Yeah. . . . what I'm saying. So she had been . . . and after she came back, there was somebody . . . Yes. So why isn't that essentially doing something to her that . . . why isn't that something that created a detrimental effect on her? Why isn't that something that undermined her previous entitlement? Well, that's the . . . Our position is she only had a right to be in this pool to be put on the app. People come and go in this business a lot, as you can tell, 13 hours a week and hardly feed a family. So there's a lot of turnover. And she was taken off the app when she left. Now, my client testified at trial, it costs five bucks a month to keep someone on the app. Costs some money. This wasn't a real big money-making place. So that's why . . . one of the reasons she was taken off. But they asked her to come back and come in and visit with the assistant manager and get her back on the schedule. And then she was eventually sent a letter, come back, and we'll get you on the schedule. My client also called her and said that if you had answered the phone when I called you, I would have asked you to come back at that time. I think she had a little bit to do with this. Maybe she was a little stubborn, disappointed that she wasn't on the app right away. But our position is she had everything after she got back, the same position as before she left on her in Alaska. So I'll keep the rest of my time for rebuttal. Thank you. Very well. We'll hear from counsel for Ms. Mace. Mr. Hagan, good morning. You may proceed. Good morning. May it please the Court, counsel, this is actually a case that I think involves more straightforward facts than was suggested during my opponent's recitation. And it also involves very important principles. Ms. Mace was a trainer. She was also a member of the Army National Guard. She was absent from work for three weeks beginning July 15th. July 15th is also the last shift that she worked. And when she left, she had an expectation that she would have a job when she returned. When she came back, she tried to text her employer. She tried to call her employer. And then he left a voicemail. And Judge Duffy concluded that that voicemail, including testimony, led her to believe that she had been terminated. She had another conversation with her general manager, David Borchardt, about four days later. She put down her speakerphone along with the person in the car because that was the only way she could listen to it at the time. Both Ms. Mace and Ms. Nelson, the other witness who testified, testified to the effect that when she spoke with the general manager, he was confused. He was of the belief that Ms. Mace had been terminated. And I think there's a distinction here because there is an application, and you must be on the application. It's called the When I Work application. In order to even be eligible to be placed on the schedule, you have to be registered or listed on an application. And she was taken off. Her fate had been sealed back in early August before she returned because Mr. Willis wanted to save $11. And this is exactly the type of factual scenario that motivated Congress to enact these statutory protections in the USARA statute. And it's exactly the type of employer conduct where you take a person who's serving their expendable that Congress wanted to prescribe and in certain cases even punish. And if you look at the factual findings by Judge Duffy, she concluded that the defendants willfully violated Mace's reemployment rights. Judge Duffy characterized as a ridiculous explanation that they wanted to save $11 a month. Well, if this is a marginal operation financially, is that too harsh? Harsher characterization? I mean, this is a cruel world that we're living in, in terms of saving money. $11 is $11 for a woman, but she also described it as a post hoc rationalization. A poor what? A post hoc rationalization. Oh, I see. After the fact. So once this all comes to light and they're, you know, effectively have to explain why she was taken off the application altogether, that's the explanation. And of course, that's not a valid objection or defense under 4312. 4312 is a very robust reemployment statute. And the language is shall be reentitled, or shall be entitled to reemployment so long as you meet three conditions. You give prompt notice, you report back immediately when you come back, and you're not gone more than five years. And of course, there's no question that my client did everything she was supposed to do. She texted her employer August 8th when she gets back. She calls him August 9th, and she's concerned, hey, I can't get into this app. You know I'm supposed to be back. And if you look at the record, page 17 of the trial transcript, I was asking Mr. Willis, you understood that when she came back, she would expect to have hours. And of course, he says yes. And what this was, he replaced her. And he did so with two new hires who were paid less than her. The timeline kind of works like this. She's coming back on August 8th. Well, on August 5th, he interviews and eventually hires a woman named Alexandra. And she's plugged in through August for schedule to begin work. She's a new hire. She's extremely green. August 8th, my client gets back, sends the text. August 9th, she makes the call. Corey Willis clearly understands that she's trying to get back on schedule. Well, August 10th, he hires a second employee, Michael. And he fills the August schedule with hours with these two employees that my client wanted to work, was eligible to work, and had a statutory right to be re-employed. And so that's, I think, throughout the briefing, what you see is an attempt to ignore evidence in the record, or that's directly contrary to the factual findings of Judge Duffy. And again, this is a court trial, so the standard is, were her factual findings clearly erroneous? No. There's certainly a basis to conclude, based on the voicemail and the testimony about the second call, that Keisha Mace was terminated. There's certainly a basis to conclude that, based on all this evidence, that Corey Mace knew exactly what he was doing. He was cutting pennies, and he was trying to, you know, save a buck. Well, as Judge Duffy mentioned, the testimony at trial is consistent with defendants' early communications with Ms. Mace. And then she said, they told her she was gone. Is that a fair characterization of the testimony? Yes. And she testified in responding to Borchardt. Remember, this is the first time she actually gets to speak with someone. She'd been trying to get somebody on the phone. Willis leaves a voicemail, and then she talks to Borchardt. And her conclusion is, so you're telling me I had a job when I left, I go and serve my country, and I come back and I don't have a job? And he's, Borchardt's obviously confused, and he tries to backtrack. And that's the point when she says, well, I need to talk to my commanding officer. And she tells him, this is against the law. She knew that. Now, there's been testimony and oral argument, or argument, I guess, from Mr. Christensen, that, you know, they tried to get her at that point in time. No. Willis called her. She didn't take the call because she wanted to take her commanding officer, talk with her commanding officer. And then two more weeks go by. Then, another employee quits, and he needs labor. And Judge Duffy made the explicit finding that the reason she reached out, he reached out to my client, Ms. Mace, was not because he was trying to correct a wrong, or rectify something, or clear up a misunderstanding. It's because he needed a body in the gym to train somebody. And that's, there's no basis in the record to say that Judge Duffy's view of the evidence was clearly erroneous. And I think the standard of review is really important here. She heard the testimony. She reviewed and examined the credibility of the witnesses. And I think the suggestion that it was a ridiculous explanation is part of her sense of how this evidence came in, and it just didn't bear up to scrutiny. That the real decision was, he wanted to get rid of her. And he did so in direct violation of what his decision. He wanted to what? He wanted to get rid of her. And he did so because she was going to be gone for three weeks. There are some defenses that the employer can put up, Greg. And were any of those raised at all, the changing circumstances, undue hardship? No. Any raised at any point during the course of the case? Right. 4312D has changed circumstances. And you see that in like a there's no evidence submitted at trial. And it's not argued on appeal that this was, you know, based on external circumstances or anything like that. So I think that issue's been waived too. And that was an express finding by Judge Duffy as well in her finding. Now, there's also the question of, okay, we have a clear statutory directive, shall be entitled to re-employment. Well, when does that entitlement arise? And if you look at the Clegg versus Arkansas Department of Corrections case, which is a 2007 case from this circuit that's often quoted in other circuit cases addressing Ysera, this circuit said, quote, section 4312 protects employees at the instant of seeking re-employment. My client comes back August 8th. She's continually seeking re-employment. And of course, her fate has already been sealed. They decided to get rid of her. But her right attaches when she comes back. What if they had put her back in the pool but never given her any hours? Right. It's a classic case of, you know, and this is why I think this case is important. An Army Ranger on the line at John Morell's in Sioux Falls, South Dakota, goes and serves his country and comes back. He's been working 40 hours. It's at will employment. He comes back and Smithfield says, well, you're still entitled to be employed, but I can't guarantee that I'll get you time. And at no point in time do they actually schedule hours. I mean, that would give an employer the opportunity to have a de facto policy of getting rid of people who are serving their country and just saying, well, you're still on schedule. We just aren't going to schedule you hours. But even in this case, those aren't the facts. She was not kept on the application and eligible for hours. She was deleted from the application. So in this case, is being on the application and being in the pool essentially the same thing? You can't be eligible for hours unless you're on the application, if that answers your question. It seemed like in the earlier argument, there was a question of, well, she wasn't on the app, but she maybe was still in the pool. I mean, could you be still in the pool? Would that really mean anything to be in the pool if you weren't on the app to actually get any hours? Not based on the way the evidence came in. I mean, David Borcher did some of the scheduling in August, and he testified that when he looked at who was there, if your name wasn't in the app, if you're not in the application, you can't then pull them over and schedule them for hours. So, I mean, I think it follows, it necessarily follows that if you're not on the app, you're not eligible to be scheduled for hours. And that was essentially what she concluded. So, what Ms. Mace was confronted with is that she lost her job because she was serving her country. And I think that gets us to the second issue, which is raised on appeal, which is whether the willfulness finding bears up on her scrutiny. This is, again, a clearly erroneous standard. And I think, if anything, the memorandum opinion undersells both the quality and the quantity of evidence that showed that this was a knowing violation. If you look at the transcript, pages 26 and 27, I specifically asked Mr. Willis, now you understood that Ms. Mace had a right to be re-employed? And he said yes. And I specifically asked him, you weren't surprised, you weren't aware of this right? And he said yes. And despite knowing that she had a right to be re-employed, he didn't re-employ her. And that's classic elements of willfulness. Judge Duffy also found that it was significant that, along April 12th or April 13th, Mr. Willis becomes aware that Keisha Mace is confirming what understanding he had. I have a federal right to be re-employed. That's not news to him at that point in time, but that only confirms what he knows. And he still waits two weeks before he finally reaches out to talks about, well maybe this is a misunderstanding. And again, this is a factual finding by Judge Duffy. It wasn't because he was trying to set things to right. She concluded, based on the evidence, that the reason he wrote that letter was because he needed another staff person. And so I think under the appropriate standard of review, there's more than sufficient evidence to sustain the finding that this was a willful violation of USERRA. And that under the applicable standard, this should be upheld. I think it's important that Judge Duffy's conclusion is upheld because it vindicates the unequivocal and unqualified language of 4312. It's also necessary to protect military personnel. And if you accept my opponent's argument about you have to be guaranteed hours in order to be eligible for USERRA protections, it entirely defeats Congress's purpose, which is to enact protections for at-will employees, for contract employees, for employees, regardless of who they are, who are absent from work because they serve their country. And that's why Congress chose to use the language of a mandatory affirmative obligation, absent proof of a defense, which would be the defendant, excuse me, the employer's burden to of extraneous circumstances making reemployment impossible or unreasonable. And again, not only do I have evidence of that in this case, it was never raised in the pleadings, it was never argued at trial, and it's not being argued today. And again, how did the letter, the three-week late letter, evidence, how is that evidence of willfulness? Well, the argument, and I think it sort of reiterated today without being specific about the timeline, is well, we asked her to come back. We asked her to be reemployed, but you need to be specific about the timing. Corey Willis said he knew before she left and before he came back that she had a right to be reemployed. He ignored that. Then he only writes the letter in late August after one of his employees quit, and he essentially needs to find another employee. So Judge Duffy found it was opportunism more than a desire to set things right, and it, you know, part of it was motivated by his desire to find a new employee. And as Judge Duffy points out, this is a strict liability statute, I guess. It is. Absent, you know, a viable defense that the employer proves it was either unreasonable or impossible to reemploy, the statute says shall be, or shall be entitled to reemployment, and that didn't happen here. Unless there are further questions. What is this kickbox thing, our business? Maybe it's irrelevant, but it's interesting. It's sort of a mix of like cardio, and so what they do is they bring people in, and you'd have an hour training, and what Keisha would do would, she'd have appointments, and she'd be eligible to walk people through this workout. I think it's also significant. In mid-May, she had a second job. So she's got two jobs. She's in the armed forces. She quits her other job so she can devote more time to working for Corey Willis and his outfit, and he understood, and they talked about it, this is at pages 56 and 57 of the record, that, of the trial transcript, that she was looking for more hours when she returned, and she had, in fact, quit her job expecting that she would be able to do that. Thank you. Thank you. Mr. Christensen. Thank you, Your Honor. Two things quickly. Ms. Mace didn't lose her opportunity at kickbox because she's in the military service. Judge Duffy concluded, in her opinion, that she found no evidence that Ms. Mace's military service was a motivating factor in defendant's failure to rehire her. That's significant. Secondly, Judge Duffy also wrote, at no time did kickbox ever guarantee Ms. Mace that she would work a certain number of hours. So our position is, we didn't put any affirmative defenses in because we need to. We didn't have any. Our position is kickbox and Corey Willis did not violate this federal law, run afoul of it. We like the law. It's a good law. It's a darn good law. It should be enforced. But we didn't do anything in violation of this statute. What she had before she left is she was on a pool of workers. What she had when she came back, she had that same status. And the law says you can't enhance someone's status. You can't expect a higher position. And I think that's what she was expecting. I understand that she did work. I get that. I understand she felt that maybe she was terminated. She wasn't. How do you square that with the testimony on pages 26 and 27? Let me just ask you a question and see if you can answer it. You were aware that she had a right to be reemployed when she came back, yes? Well, that is the testimony. Later on, you are claiming you were somehow surprised and unaware of Keisha's legal rights. Right? Answer it. Right. Well, I agree with that 100%. That's our position. You're saying this wasn't a violation of her legal rights. No. That's how you square the testimony with her. Well, he may have not thought that through a little bit. I doubt that he'd ever read the federal law on it. But what we're saying is that we had no idea. We had no reason, no desire not to get her back on the schedule. The short-term schedule was already made. She wasn't on it. She was off the app because he was saving some money. And I agree with you, Judge Woolman, that was a small thing. But that adds up in a business that probably wasn't doing that well. They didn't do anything wrong. And when Corey Willis, my client, called her and she wouldn't answer the phone, I think that was two days after she came back. See? I mean, he was on it. He talked to her about it. The misunderstanding that we talk about is that she's thinking that she was employed and had a right to hours, although she testified, she wasn't guaranteed any hours, and she knew that. And I think that's the issue before the court. What does that mean? See? And your question, I don't think got properly answered. If Ms. Mace was in the pool before and she was in the pool after and she wasn't put on the app, if you're in the pool, that doesn't give you any right to be on the app, to be on the schedule. If you're on the schedule, that means you're going to work. You have hours. There's no guarantee that Kickbox or Corey Willis had to give her any hours. That's the distinction in this case. If you're a teacher and you have a contract, go serve, come back, you're going to be a teacher again. So, that, those are the facts. And no guarantee is the, oh, thank you. Very well. Thank you for your argument. The case is submitted and we will take it under consideration.